United States District Court
Central District Of California

DEREK A. CAPOZZI
Plaintiff

v.

Civ. No. EDCV10-239 AHM (DTB)

THE UNITED STATES
Defendents

FILED
DEPUTY
SEP 13 2010
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

2nd Amended Complaint
Pursuant To 28 USC §§ 1346
(b) 1402 (b), 2401 (b) and
2671-2680 — Federal Tort
— Claims Act —

A. Previous Lawsuits.

(1.) The plaintiff has not brought any other lawsuits in this, nor any other, matter [Ever] before.

(2.) This is the only lawsuit being pursued by plaintiff at this time.

B. Exhaustion Of Remedies

(1.) The Federal Bureau Of Prisons requires that a Standard form 95 prescribed by the Department of Justice, 28 CFR 14.2, be filed before a plaintiff my proceed in Court.

(2.) On 4/5/09 the plaintiff did file the required form 95 with the Bureau of Prisons. On 4/21/09 they received it under: Administrative Tort Claim No. TRT-WXR-2009-03744, which they subsequently "denied" approximately six months thereafter.

(3.) Due to being transferred several times since that time, the denial papers have been lost. Therefor a copy is not available at this point in time for the Court to review.

C. Jurisdiction

This complaint alleges that a violation of the Federal Tort Claims Act by the negligent or wrongful acts or omissions

-3-

of federal employees acting within the scope of his/her employment at the United States Penitentiary Victorville, in Victorville, CA on May 18, 2008, where plaintiff did then reside.

The plaintiffs' rights were violated by the actions of the defendant/employees as set forth below, said actions having been directed against plaintiff before, during and after the date of May 18, 2008. Jurisdiction falls under 28 USC § 1346 (b).

## Claim I

(A.) Pursuant to 18 U.S.C. § 4042, the Bureau of Prisons owes a statutorily-mandated duty of care to plaintiff Capozzi (and other inmates) "to provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States," and "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States..." See U.S. v. Muniz, 374 U.S. 150 (1963).

The defendant/employer breached this duty — as described below. The breach caused the harm (described below) to the plaintiff, and the plaintiff has suffered — and continues to suffer — damage (described below) as a result.

(B.)

Prior to, and continuing through, at least May 18th 2008, the listed defendants along with other John Does not yet known by the plaintiff at this time, did knowingly, willfully and intentionally act in a deliberately indifferent manner, and did act with malicious intent and negligence, in both their official and individual capacity, while employed by the Federal Bureau of prisons at the United States Penitentiary Victorville, Victorville, California, creating and allowing for Mr. Capozzi to be incarcerated under conditions which did pose and cause a substantial risk of serious harm.

The defendants are responsible for permitting

a level of pervasive risk of harm, negligently, and maliciously and intentionally, to all inmates within the prison in general, and toward Mr. Capozzi in particular. Defendants were aware of this objectively intolerable risk of harm, indeed the defendants intentionally, willfully, and maliciously caused it, and subjectively disregarded it. This led to Mr. Capozzi being subjected to near-fatal stab wounds to his face, neck, heart, body, arms and hands on May 18th, 2008. These injuries required open-heart surgery, to repair two holes through Mr. Capozzi's heart. Surgery to repair a stab wound through Mr. Capozzi's neck. Numerous sutures to close wounds to Mr. Capozzi's face, lip and hands. A front tooth broken from a stab thru the face. Staples to close a hole made half-way through Mr. Capozzi's forearm causing numbness and loss of sensation

to his left thumb. Stapler to close surgical opening of his chest cavity from neck-to-lower-stomach. Wires to close his chestplate, post-surgery, which causes ongoing severe pain and suffering.

Mr. Capozzi also recently learned of a third - previously unfound - hole within the septum wall chamber of his heart. This hole has caused over 20 months of non-stop complications (i.e., breathing difficulties, anxiety, heart arrythmias, leaking valves) and requires open-heart surgery to repair or it shall lead to the death of Mr. Capozzi. The surgery alone has a verified "high mortality rate". These factors have caused Mr. Capozzi to suffer over 20 months (and continuing) of non-stop pain, suffering and anxiety as well as resulting depression, mental anguish and physical disabilities.

Had defendants taken reasonable security measures to abate the pervasive level of violence within USP Victorville, Mr. Capozzi would not have been so harmed.

Had they taken reasonable security measures to abate the substantial risk of harm which they possessed "subjective

Knowledge" of, regarding Mr. Capozzi in particular, he would not have been so harmed.

The defendant/employeer are responsible for the harm caused to Mr. Capozzi as they intentionally, willfully, knowingly and/or negligently did promote, encourage and/or permit a pervasive level of violence at USP Victorville resulting in the near-fatal stabbing of Mr. Capozzi

Their actions and/or omissions and negligent conduct violates also, California penal codes for Assault and battery, misprison of a felony, Assault to kill, Conspiracy and attempts to commit such acts, aiding and abetting such acts, and Federal such violations, to also include, conspiring to violate civil rights of inmates, Civil/Crim. RICO Federal violations and Code of Federal Regulations/B.O.P. institutional Policy, Rules and Regulations, All in violation of 18 U.S.C. § 4042.

(C.)

Supporting facts:
(1.) In early 2008 plaintiff arrived at USP Victorville. Upon arrival he was brought before a "Captain Bourne" and "Lt. Hurte". They asked Mr. Capozzi if he had any enemies known to be within the prison. Mr. Capozzi thereafter replied to these employees that he

was a lifelong resident of Boston, has never been in the state of California before, and therefore does not have any enemies known to him. Captain Bourne and S.I.S. Lt. Hurte asked Plaintiff "Who do you run with?" and Mr. Capozzi stated "Nobody. I'm from Boston." They then advised Mr. Capozzi that this was "not Boston", that this "is a gang-yard", that it was "run by the gangs" and asked then if Mr. Capozzi was a gang-member, to which he stated he was not. They then advised Mr. Capozzi that he should "pay your bills" if he acquired any and told him "good luck. This is a dangerous yard so watch yourself out there." and released Mr. Capozzi to the general population. Mr. Capozzi had no further dealings with staff at the U.S.P from that point thru May 18th, 2008.

(2.) On May 18, 2008, at approx. 11:20 a.m., while on a walkway at the U.S.P, Mr. Capozzi was stabbed repeatedly by an unknown prisoner. During the altercation, Mr. Capozzi was stabbed in his heart, neck, face, arms and body. He was stabbed by a metal knife, approx. 8" long, 1/8" flatstock-type homemade weapon, 1" wide and sharpened on one end to a point. Responding staff then struck Mr. Capozzi in the eye socket with a mallet-type weapon as Mr. Capozzi was submitting for staff to restrain him, resulting in a fractured eye-socket and nearly detaching his retina. As

Mr. Capozzi was being escorted away from the scene to
a medical physician, he was asked "Why'd this happen?
Why'd that guy do this to you?" to which Mr. Capozzi
is alleged to have responded "I don't know. I don't even
know who the guy is that did it". At that point, staff
reports assert Mr. Capozzi stated: "I can't breathe" as he
collapsed to the ground unconscious.

(3.) Mr. Capozzi died and was revived by medical
personnel three (3) times en route to Loma Linda University
Hospital, Loma Linda, California and throughout surgery. He did not
awaken until the following day while in the intensive care
unit, where he stayed 10 days before being taken from the hospital.

(4.) After awakening, Mr. Capozzi was approached by
an unknown F.B.I. agent along with SIS Lt. Hurte.
They advised who they were and stated they were there to
ask Mr. Capozzi questions as to what had happened. Mr.
Capozzi asserted that he had no idea why this incident
had happened and that he did not want to discuss it.
The F.B.I. agent expressed a desire to press criminal
charges and wanted Mr. Capozzi's cooperation. Mr. Capozzi
stated that he did not want criminal charges against
anybody, and that he would not testify against any
suspects in any criminal trial so they would be
wasting their time. The F.B.I. then stated that she (the agent)
was going to pursue criminal charges anyways because,
she asserted: "We already spoken to [the suspect] and witnesses,

and we have the whole thing on film. Derek, please, talk to us. — this man tried to kill you. We have the tape. We watched him exit his unit and attack you. We already talked to witnesses — you didn't do anything to deserve this ... won't you please talk to me?". At that point Plaintiff Capozzi began to feel ill and the interview ceased.

(5.) A day or two later, S.I.S. officer "Moore" was doing overtime duty at the hospital. Mr. Capozzi awoke and S.I.S. Moore told Mr. Capozzi that he (Moore) had been one of the responding officers on scene when Mr. Capozzi was stabbed. Mr. Capozzi asked S.I.S. Moore "Can you tell me what happened?". S.I.S. Moore detailed that he was "right there when you collapsed" and claimed Mr. Capozzi stated "I don't think I'm gonna make it" before collapsing. He then said he rode in the medical helicopter and watched Mr. Capozzi actually die and be revived. He solemnly described how the Plaintiff's eyes rolled back, he "turned all grey" and his "heartbeat stopped beating" as Capozzi "smelled like death" and he (Moore) "prayed over your body for god to not let you die". At that point, S.I.S. Moore told Mr. Capozzi that he (Capozzi) should consider turning his life over to god "because I believe all things happen for a reason" and Mr. Capozzi's survival was "a miracle".

(6.) S.I.S. Moore then asserted that after Plaintiff

Capozzi was in the hospital, S I S Moore returned to the USP, cordoned off the crime scene with police-tape, reviewed the video footage and preserved it, searched the scene and he also secured and searched Mr. Capozzi's cell, interviewed some witnesses and turned the investigation over to S I S Lt. Hurtz and the F B I.

(7.) S I S Moore alleged that he received informant information prior to May 18th, 2008 that Mr. Capozzi was involved in distributing and purchases of heroin at the USP, that Mr. Capozzi's life was in danger and that Mr. Capozzi was an associate of a prison-gang called the "Aryan Brotherhood" (A.K.A "A.B."). S I S Moore also stated that the person who stabbed Mr. Capozzi had told staff and the F B I that Mr. Capozzi was "selling heroin for the aryan brotherhood", that he felt Mr. Capozzi had "disrespected" him by refusing to sell him heroin "on credit", that "the aryan brotherhood are trying to kill me. Don't put me near any A.B. or A.B. associates — put me with skinheads only."

(8.) S I S Moore stated "Does this have anything to do with the incident in December with the A.B.'s and the skinheads?". The Plaintiff asked what the incident referred to was about as he had no idea what the relation to, or incident was about. S I S Moore then related that in December, 2007, the person

-12-

suspected of stabbing Mr. Capozzi was involved in a "gang-related riot between the aryan brotherhood and their associates", and another group labelled "the skinheads and their associates." S.I.S. Moore then stated that ~~still~~ "the skinheads were ~~st~~ almost all transferred" but that "some were let back out", and he identified the person accused of stabbing Mr. Capozzi as one of those people belonging to the skinhead group whom they "let back out to population with all the aryan brotherhood members and associates", after the alleged riot. Mr. Capozzi stated he did not know this.

(9.) At that point, S.I.S. Moore asserted that "we got information that this guy was gonna get 'hit' but nobody locked him up. They should have taken him off of the yard before something happened and this wouldn't have happened."

(10.) S.I.S. Moore further stated that he had also received informant information, prior to ~~being~~ Capozzi being stabbed, that Mr. Capozzi "had been involved in alot of drug dealing activities" and "was selling heroin" as a part of his "association with the aryan brotherhood" and also had incurred "substantial debts" and that Mr. Capozzi's "life was in danger — someone was gonna 'hit' you." After stating this, S.I.S. Moore went on to say "I feel terrible that I didn't lock you up and investigate this... I think that you wouldn't be here today if I had done my job."

but that he "thought you'd be okay", while claiming that "The SHU was so full we didn't have the room to lock you up" at the time.

(11.) On another day while at the hospital, Mr. Capozzi was told by a heavyset unknown lieutenant of Mexican heritage that he had "Read all the reports before I came here" to hospital duty. He then asserted that "They guy who stabbed you told the F.B.I and S.I.S that you sold heroin and had been disrespecting him by refusing to provide him heroin on credit" and that "he told them the A.B. was out to get him [from the incident in December] and he decided he was going to 'get one of them' before they get him" and that Mr. Capozzi was an associate of theirs, "who sold their dope."

(12.) After returning from the hospital to the USP, SIA Hostead pulled Mr. Capozzi out of his cell to visit the medical doctor. En Route, he advised Mr. Capozzi that a friend of Mr. Capozzi's was "at the medical" waiting for them and SIA Hostead would allow them a "couple of minutes to talk." During the walk there, SIA Hostead spoke openly to Mr. Capozzi, and asserted, in summary, the same allegations S.I.S. Moore had related to Mr. Capozzi above. In doing so, SIA admitted to knowing of all of the same facts S.I.S. Moore admitted, and claimed to know even more, but that he could not reveal anything more to Mr. Capozzi about what he knew because he was very

-14-

concerned about "Liability".

(13.) Subsequently, Mr. Capozzi spoke with S.I.S Lt. Hurte, the Assistant Warden Alli, and Warden Norton* at his cell door in the SHU weekly. In his discussions, Mr. Capozzi expressed a desire to be let out of the lock-up unit so that he may obtain better medical and hygiene care in population. All of the above individuals told Mr. Capozzi (at first) that they were going to release him from the SHU for these reasons. Later, they instead determined to "ship" Mr. Capozzi to another USP in Kentucky. When Mr. Capozzi asked "why are you shipping" him, all of the above persons claimed that they were going to let him back out to population so he could obtain better hygiene, and medical, treatment, but that Mr. Capozzi's mother had contacted U.S. Senator John F. Kerry to learn what had happened to her son and "Now that you've got Senators and Congressmen calling here, we're not keeping you here — you're too much of a liability."

(13.) During that time-period, S.I.S Lt. Hurte and Captain Bourne repeatedly advised Mr. Capozzi that they *⊗

⸻

* Captain Bourne also stated these same things, and also stated that S.I.S Lt. Hurte, and himself, filed reports and recommendations to the Warden recommending Mr. Capozzi be released from SHU.
⊗ All staff named herein and there unknown is whom "they" refers to.

had known all along (Prior to May 18, 2008) that the person who'd allegedly stabbed Mr. Capozzi had previously been said by informants at the USP to their staff "to be in danger of physical harm by the A.B." and claimed that because they interviewed that person and other witnesses [*] they now knew Mr. Capozzi had "no known enemies at the USP they needed to worry about," and would therefor be releasing Mr. Capozzi to population "once you heal up a little longer." They also stated to Mr. Capozzi that "we've spoken to several people and we know you were not the intended target, that was a p.c. move he pulled to 'get off of the yard'". They both also reiterated the same facts S.I.S. Moore asserted at the hospital over several conversations.

(14.) Mr. Capozzi waited approx. 4 months in the SHU (lock-up unit) at USP Victorville before being transferred. During that time, All of the above-named staff, including S.I.S. Terrones and other unknown correctional officers worked in the SHU, or walked-by the cells in the SHU weekly to speak at the doors with prisoners. During that time, Mr. Capozzi was told by numerous officers that either viewed the video footage, or had been present at the scene of the incident that the suspect was observed to have exited his housing unit, that the suspect allegedly walked directly "thru a [large] metal detector" which sounded

[*] subsequent to Mr. Capozzi being stabbed — not prior to.

a loud buzzing alarm and lit up with
bright red lights to alert the officer monitoring
it to the presence of contraband metal
on the prisoner's person. That the officer did
not stop nor search that suspect but
instead ignored him. The suspect then allegedly
withdrew the homemade knife, on videotape, from
his waistband and used it, in the incident
described herein, causing near-fatal lifelong injuries —

(15.) During Mr. Capozzi's stay in the SHU,
the same staff named herein repeatedly made open
statements acknowledging the extremely pervasive nature
of violence at the USP in general. At one point
these staff asserted "I've got 240 beds in the
SHU here and right now I've got 160-180 of
them beds filled up with inmates on protective custody
status." (as an excuse as to how come so many of
the prisoners were having a difficult time getting a transfer
without having to wait in the hole "for 1 year.") Almost
all of these protective custody prisoners were "physically
assaulted," due to the pervasive nature of violence levels
at USP Victorville. Had these prisoners been transferred
promptly, SHU beds would've remained available to prevent
prisoners from being assaulted by staff's failure to lock-
up prisoners "cuz there's no beds available" when they
receive threats against prisoners provided to them by informants.

16) In or about the first week of March, 2010, Mr. Capozzi met and discussed with numerous prisoners at the United States Penitentiary Lewisburg, Lewisburg, PA, the facts and history of USP Victorville and his claims of misconduct. In so doing, numerous prisoners, including one Jeffrey Nagle, disclosed to Mr. Capozzi that numerous staff (known and unknown) from USP Victorville named herein (ie, Warden Norwood; S.I.A Hokeman; S.I.A Hostead; Captain Bourne; A.W. Ali; Lt. Hurte, S.I.S officers Moore, Terrones — and others...) had been and/or currently remain "under investigation" for and/or "accused of", by the F.B.I, U.S. Attorney's Office, Dept. of Justice, and/or other departments, of allegations that they did knowingly, willfully and intentionally allow numerous prisoners, and requested numerous prisoners, to assault, beat, harm, extort and threaten other inmates within the prison in an effort to "control" the majority of those inmates thru the use of, or threatened use of force, violence and fear. The inmates who did the work of these officials were allegedly permitted to commit such acts in exchange for "working" for S.I.S, S.I.A, and Captain

-18-

BOURNE — whose actions were known to and approved of by their superior. As they had a "working" relationship with these staff at USP Victorville, these inmates had disclosed the acts, omissions and actions of such other inmates within the institution for offenses they committed, such as: "cell thieving" to "drug usage" and such other infractions as not paying "drug bills" obtained on credit from other inmates and "disrespect" toward other inmates, themselves, or even staff. These actions took place during and prior to Mr. Capozzi's assault, and did lead to and cause Mr. Capozzi to be stabbed as described herein.

(17.) Mr. Capozzi also has learned that these inmates were permitted carte blanche to commit a variety of offenses themselves, as described herein, so long as they maintained a "working" relationship with staff by: (1.) providing staff with information regarding rule infractions of other inmates, (2.) Not utilizing knife-type weapons during their own assaults they committed, (3.) Not committing, nor allowing others to commit, "killings", (4) keeping a desired level of "control" or "order" requested by these staff by this permitted use of force, violence and fear or intimidation over other inmates within the prison, which actions led to and caused Mr. Capozzi to be stabbed as described herein.

(18.) Mr. Capozzi also has learned that other

inmates have filed complaints in federal court (including a Civil RICO complaint) based upon these very allegations, and that the F.B.I, D.O.J., AUSA Office and other agencies, (and the B.O.P) have received similar complaints and investigated similar actions. That the very parties named herein are the subjects of these and other investigations and complaints... These actions caused Mr. Capozzi harm, as described herein.

(19.) That these allegations have contributed to the cause of action made herein to the simple facts alleged by Mr. Capozzi. That it so being, all of the defendants allowed for, encouraged, promoted and permitted for (and covered for) the commission ~~across~~ of such activities did lead to a pervasive level of violence within USP Victorville which resulted in inmates policing inmates thru the use of violent means and ways on behalf of the staff. Causing Mr. Capozzi harm, as described herein.

(20.) That in so doing, these staff relied upon criminal informants and otherwise cooperating inmates to run the prison, wherein staff failed to protect Mr. Capozzi by failing to lock him up ~~down~~ for his protection when they'd previously received information of his safety being in danger, as they instead let

-20-

nature take its course. Causing Mr. Capozzi harm, as described herein.

(21.) In so doing, there staff failed to lock-up, investigate or protect Mr. Capozzi's alleged assailant when they'd previously learned his safety was endangered, thereby leaving him to roam the Penitentiary to protect himself by his own devices, because, as the investigations, paperwork, and three federal civil complaints previously filed allege, those criminal informants who'd worked for the USP Victorville staff were the same group of inmates — in part — whom had sought to harm Mr. Capozzi's alleged assailant in the previous melee months before, and thereafter.

(22.) Mr. Capozzi hereby asserts that discovery does establish that Staff permitted inmates to commit various acts of violence as described herein, and that Mr. Capozzi's suspected assailant was in fact the subject of violence, force, threats or intimidation by those inmates, yet defendants failed to do anything to protect him, by which then Staff did cause Mr. Capozzi to be harmed as described herein.

(23.) Mr. Capozzi hereby asserts that discovery does establish that staff permitted cooperating

inmates to commit various acts of violence as described herein and Mr. Capozzi was unwittingly associated with those inmates, then staff are also responsible for causing the harm to Mr. Capozzi described herein.

(24.) Mr. Capozzi hereby asserts that discovery does establish that staff permitted inmates to commit the various acts described herein, they knew of them but failed to report them as required by statute, policy and law, then they did cause the harm to Mr. Capozzi described herein, as a result.

(25.) Mr. Capozzi hereby asserts that discovery does establish that staff knew of their co-workers, and underlings, (and superiors) actions, acts, omissions as described herein, yet failed to report said incidents in violation of rules, regulations, and laws and did thereby cause Mr. Capozzi to be harmed as described herein.

(26.) Mr. Capozzi hereby asserts that the actions described in pghs 1-25 herein do violate both the Constitutional Rights of Mr. Capozzi under the 4th, 5th

-22-

8th and 14th Amendments, and do violate the Criminal Laws of the California Penal Codes and Federal Criminal Codes in as much as they aided, abetted and assisted the assaults, force, violence, threats, extortion, illegal tactics used which caused the harm(s) alleged herein leading directly to Plaintiff nearly being killed. All of which forms an independent basis for a violation of 18 USC § 4042, for each individual act, or for several acts committed under a totality of the circumstances.

(27.) Mr. Capozzi also asserts that the allowing of the suspected assailant to pass thru a metal detector, setting it off, and letting him continue onward without searching, stopping or investigating further did cause Mr. Capozzi to be harmed as described herein, and failed to provide him with the duty of care owed prisoners under 18 USC § 4042, as the officers are required to stop and/or search any prisoner who sets off a metal detector in a United States Penitentiary.

28.) Mr. Capozzi also asserts that the guard who smashed him in the eye-socket and fractured his eye with a mallett committed a direct assault and battery in violation of both California Penal Code and violated the provisions of 18 U.S.C. § 4042 as well.

<u>IV. Claims For Relief Forming 18 USC§ 4042 Violations.</u>

(1.) Mr. Capozzi hereby asserts that the defendants actions, statements, ommissions, failures to act, documents, log books, and video surveillance tapes clearly establish that the defendants have violated Mr. Capozzi's Constitutional Rights under the Eighth Amendment to remain free from Cruel and Unusual Punishment as implicated in the United States Supreme Court decision of <s>US v.</s> <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994) in that the defendants were deliberately indifferent to the substantial risks of serious harm. Where they knew of and disregarded an <u>EXCESSIVE</u> risk to inmate Capozzi's health or safety. Defendants failed to protect Mr. Capozzi when they knew that there was a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. ⊛ In <u>Robinson v. Prunty</u>, 249 F.3d 862 (9th Cir. 2001), a prisoner brought suit by making his proof of deliberate indifference and substantial risk of harm by presenting "prison videotapes" and "incident reports" verifying the numerous incidents of physical confrontations between different prison gangs and races. <u>Id.</u> at 865. The Ninth Circuit affirmed the lower court's rejection of qualified immunity for prison officials, noting that Robinson's "evidence paints a gladiator-like scenerio in which prison guards are aware that placing inmates of different races in the yard at the same time presents a serious risk of violent outbreaks." <u>Id.</u> at 867. Mr. Capozzi claims here that USP Victorville defendants herein created similar circumstances within the prison here, leading to 160-180 Special Housing Unit beds (on a daily average) out of 240 beds which

⊛ Defendants also acted in violation of State/Federal law, and BOP Policy and procedure and (criminally) caused the harm detailed in sec. "☒ Facts" against Mr. Capozzi, Realleged herein.

were designed to house disciplinary sanctioned inmates and/or inmates pending disciplinary investigations mainly, being instead used #to to house long-term protective custody inmates — clogging the SHU and rendering a breakdown in effectively protecting those inmates in the general population. As a result the defendants engaged in a pattern of failing to investigate, question, lock-up, or protect the inmate accused by staff of stabbing the plaintiff when they were made aware of his life allegedly being endangered, and they did the same with the plaintiff, resulting in two ignorant prisoners lives being endangered, possibly without any knowledge to themselves at all, and left to their own devices upon a crash course. Having confined prisoners for criminal, often violent, conduct and having "stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course" and permit prisoners to prey upon one another. Farmer v. Brennan at pg.s 833-34. As described in the "Factor", section herein, defendants promoted this.

     Had officials placed either the suspected assailant or Mr. Caposo into lock-up pending an investigation — as is the Federal Bureau of Prison's Policy — upon having learned of the threats made against either of them, then Mr. Caposo would not have suffered such physical and mental harm.

     Had officials transferred the suspected assailant upon transferring the other group of individuals allegedly involved in the mentioned gang-riot only a few months prior, then Mr. Caposo would not have been stabbed.

Had officials, namely the unknown official at the metal detector believed to be % Black — defendant/employee herein — not permitted an armed prisoner to waltz through a metal detector in his presence (while on camera), setting off the metal detector, failing to stop or search said prisoner, then Mr. Capozzi could not have been stabbed with a metal 8" by 1" flatstock homemade knife in that officers presence only seconds later. This inaction violated Federal Bureau of Prisons Policy and Procedures for searching inmates who fail to pass through a Metal detection screening device without setting it off for the known presence of metal.

(2.) The realleged and incorporated paragraphs 1-28 of Section "Facts" herein violated Federal and State laws wherein each and every employee is responsible and liable for the harm caused to Plaintiff Capozzi, and his continued pain, suffering and mental/emotional anguish wherein each defendant aided, abetted, assisted, acquired in, and was an accessory before and after to a conspiracy to commit assault(s), beating(s), extortion(s), violence, threats of violence, misprison of a felony, failure to report such offenses, promoting, procuring and inducing others to commit such offenses, and conspiring to deprive inmates of their basic human rights under the 4th 5th, 8th and 14th Amendments to Due Process of

~ 26 ~

Law, and Safe Conditions of Confinement, equal treatment amongst inmates, Cruel and Unusual Punishment Avoidance, ... and they did so knowingly, willfully and intentionally, with malicious intent and deliberate indifference, In violation of BOP Policy, Procedures and USP Victorville's individual Departmental Manual On Operations Standards, And did Conspire To Violate, the Civil Rights of various prisoners, including Mr Capozzi, resulting in his injuries.

Prayers For Relief.

(1.) Mr Capozzi hereby declares that the acts and omissions described herein violated his rights under the Constitution and Laws of the United States and The State of California, resulting in his injuries. All in violation of 18 U.S.C § 4042.

(2.) Mr Capozzi respectfully seeks relief in the amount of five (5) million dollars. The sought relief is for ~~punitive~~, compensatory, and any other available and reasonable damages, which are made allowable under the law. Particularly for his extreme emotional distress, pain, suffering, mental anguish, anxiety, panic attacks and depression from the defective heart he now suffers, and possible death upon imminent future surgeries needed as well.

(3.) Plantiff hereby requests a trial be held on all issues triable as soon as possible.

(4.) Plantiff requests all costs in this suit.

(5.) Plantiff requests any additional relief this court deems just, proper and adequate and equitable.

Date: Sept 7th, 2010

Respectfully Submitted

Derek A. Capozzi, Pro Se
FMC-Lexington   #22016-038
Box 14500
Lexington, KY 40512

Verification

I have read the foregoing complaint and verify that all matters herein alleged are truthful and accurate to the best of my knowledge, information and belief and I do believe them to be true. I certify under perjury the foregoing is true and correct.

Signed, Derek A. Capozzi

Derek A. Capozzi, Pro Se

I do hereby certify that a true copy of the foregoing Amended Complaint has been served upon Eli Ben-Shmuel, Atty. for defendants, Signed, Derek Capozzi / Derek A. Capozzi